USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __11/12/2020__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Robert J. Berg,

                              Plaintiff,

          -against-

                                                        OPINION & ORDER
                                                        18-cv-1002 (NSR)

Village of Scarsdale and Village of Scarsdale
Police Department,
                              Defendants.

NELSON S. ROMÁN, United States District Judge:

*Pro se* Plaintiff Robert J. Berg ("Plaintiff" or "Berg") brought this action under 42

U.S.C. § 1983 against Defendants Village of Scarsdale (the "Village") and the Village of

Scarsdale Police Department ("Police," collectively, "Defendants") challenging the

constitutionality of certain provisions of the Scarsdale Village Code (the "Village Code") which

governs the posting of signage, including political signs, within the Village. Presently before the

Court are Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") (ECF No. 39) and

Defendants' Cross-Motion for Summary Judgment ("Defendants' Cross-Motion") (ECF No.

43). As explained below, the Court GRANTS Plaintiff's motion for summary judgment to the

extent it asserts that Defendants' enforcement of the Village Code violated his First Amendment

rights by selectively enforcing the signposting laws against political speech relative to other

forms of speech and DENIES Plaintiff's motion as to the remaining claims. The Court GRANTS

Defendants' Cross-Motion to the extent it asserts that the relevant ordinances are constitutional

under the First and Fourteenth Amendments but DENIES their motion to the extent it asserts

that their content-based enforcement was consistent with the First Amendment.

## BACKGROUND

All facts are taken from the Plaintiff's Statement of Undisputed Material Facts ("Pl.'s SUMF") (ECF No. 41), Defendants' Response Pursuant to Local Rule 56.1(b) to Plaintiff's Statement of Material Facts ("Defs' SUMF Resp.") (ECF No. 49); Defendants' Statement of Undisputed Material Facts ("Defs' SUMF") (ECF No. 47); Plaintiff's Response Pursuant to Local Rule 56.1 to Defendants' Statement of Undisputed Material Facts ("Pl.'s SUMF Resp.") (ECF No. 50), the parties' affidavits, declarations, and exhibits, and are uncontested except where indicated.

### I.  Plaintiff's Political Speech

Plaintiff lives in the Village "in a house that is located approximately 30 feet from the roadway and right-of-way. The roadway and right-of-way is located approximately 16 feet from the wall to the north of the circular driveway and contains what appears to be a large grass area. The curb line is approximately 11 feet from the property line." Goessl Aff. ¶ 8; *see* Goessel Aff. Exhibit (survey of Plaintiff's property dated July 22, 2002 and certified to Plaintiff and another). Defendants admit that Plaintiff's front lawn is "almost entirely within the Village's right of way of 13 feet." Defs' SUMF Resp. ¶ 15. As of February 2018, Plaintiff had lived at this location within the Village for 16 years and continues to reside there today. *Id.*

In the weeks before the February 8, 2018 School District School Facilities Bond Referendum (the "Bond Referendum"), some residents, including Plaintiff, expressed their support for the Bond Referendum by posting "Vote Yes" placards, which "generally consisted of a corrugated weatherproofed placard 18 inches long by 12 inches high" made of "[t]wo thin straight wires with cross supports [] stuck into the base of the placard." Defs' SUMF Resp. ¶ 5. Plaintiff admits that many of these Vote Yes signs were placed in the Village right-of-way. Pl.'s SUMF Resp. ¶

25. Other residents posted "Vote No" signs that were larger in size. Defs' SUMF Resp. ¶ 7.

Plaintiff admits that "[t]he Vote No signs did not appear to be posted within the Village right of

way." *Id.* at ¶ 8.

On February 1, 2018, Plaintiff emailed the Village Attorney, Police Chief, and Village

Manager, informing them that he "had been contacted by several residents" who posted Vote

Yes signs "within the 13 foot Village right of way" and claimed that the signs "do not in any

way obstruct the Village's use of the right of way." Berg. Aff. Ex. 21 ("Feb. 1-2 Email Chain")

(ECF No. 40-36) at p. 4 of 4. Plaintiff asked for clarification on the "Village's political sign

policy with respect to residents placing political lawn signs on their private lots within 13 feet of

the curb and on police enforcement of the same." *Id.* The Village Attorney responded, in

relevant part:

> because the Village owns the right-of-way, it is unlawful for anyone to place a
> sign or advertisement on Village property without permission or authority.
> Subject to the requirements of the [Village Code], residents may place signs on
> their property, excluding that portion of the property that constitutes the right-of-
> way.
>
> The Village and its police department does not selectively enforce the provisions
> of the above mentioned statutes. If fact, the police department is in possession of
> many signs (i.e. real estate, commercial etc. . . .) that were improperly placed in
> the Village's right-of-way and subsequently removed by the police. Some of these
> signs are currently being held for safekeeping.
>
> Bob, I believe that your misconception is that property owners own the right-of-
> way. They do not. The Village owns the right-of-way.

*Id.*

Following these emails, Plaintiff removed his Vote Yes sign from within one foot of the

street curb (within the right-of-way) where he claims it "had maximum visibility to the traffic

passing down the street," to "leaning against the brick wall in front of [his] house under a tree

about 15 or more feet from the street side curb," where he claims it was "completely out of

drivers' line of sight." *Id.* at ¶ 25.

On February 6, 2018, the Court granted Plaintiff's application for a preliminary

injunction and temporary restraining order, enjoining Defendants from taking any actions against

Plaintiff or other persons with respect to posting political lawn signs in the Village right-of-way

in front of private homes, so long as said political lawn signs pose no safety or traffic hazards.

(ECF No. 6).

## II.    The Village Code

The Village Code codifies, among other things, the laws governing the ability to post

signs in the Village.

**Restriction on Posting Signs in Public Places**: Chapter 196 of the Village Code is

entitled "Littering and Handbills" and contains Section 196-17 "Posting notices in public places"

which provides:

> No person other than a duly authorized official or employee of the village shall
> post, attach or display any sign, notice, placard, poster, or other advertising
> medium to or upon or over any sidewalk, tree, stone, fence, wall, pole, railing or
> other object in, along, upon, or over any street, park or other public place in the
> village.

Affidavit of Stephen Pappalardo ("Pappalardo Aff.") at ¶ 4 (ECF No. 44). That chapter contains

definitions at Section 196-2 including for "public place," which is defined as "any and all streets,

sidewalks, boulevards, alleys or other public ways and any and all public parks, squares, spaces,

grounds and buildings." *Id.* at ¶ 6.

**Written Permit Required to Obstruct Public Places**: Section 256-1 provides:

> No person shall obstruct any street, sidewalk, public easement or other public
> place without first securing a written permit from the Village Engineer and
> complying with such regulations affecting obstructions as the Village Engineer
> may prescribe . . . . The Village Engineer's decision to grant or deny a permit

> application shall be made within three business days after a completed permit
> application has been received by the Village.

Papalardo Aff. ¶ 7. The "requirement that the Village Engineer make a decision in three business days after receipt of a completed permit application was added in response to the Court's decision on Plaintiff's request for a temporary restraining order." *Id.* at ¶ 8. Chapter 256 does not have a definition section and the Village Code does not define "obstruct" or "obstruction." Matturo Dep. Tr. at p. 17 of 41. The Village Manager interprets the term to mean that "[i]f any object is placed or erected in the right-of-way, it thereby excludes anyone else from occupying that space and, hence, is an obstruction." Pappalardo Aff. ¶ 9. The Superintendent of the Department of Public Works testified that "obstruct" under Section 256-1 means "placement of an item or something without permission," that the Section is not limited to visual obstruction, that an obstruction is "anything that is placed in the village right-of-way, that is not normal to the village right-of-way, in terms of an installation, it doesn't distinguish between a temporary or permanent." Berg Aff. Ex. A ("Salanitro Dep. Tr.") at p. 11 of 17 (ECF No. 40-4).

**Other Relevant Code Provisions**: Section 281-2 defines "right-of-way" as "[g]enerally, the space owned by the Village extending approximately 13 feet from each curbline, but may include specific lands under an agreement or definition of law." Berg Aff. Ex. 9 ("1/29/2018 Altizio Email") (ECF No. 40-24). The Village Engineer testified that

> A right of way exists on either side of the paved area of a road in the Village, that
> areas is reserved when the original subdivision of the property is approved or
> filed for various municipal purposes, including future road widening, installation
> of sidewalk and utilities or other furtherance of other permissible municipal
> purposes. As a general matter, for a 50-foot road, the Village right-of-way is 13
> feet on either side of the paved roadway in Scarsdale.

Affidavit of David Goessel ("Goessl Aff.") ¶ 15 (ECF No. 45); *see* Berg Aff. Ex. 27

("Pappalardo Dep. Tr.") at p. 3 of 21 (ECF No. 40-42). Plaintiff admits to these definitions of the

Village's right-of-way. Pl.'s SUMF Resp. ¶¶ 3  4.

The Village Engineer's review of an application for the permit mentioned in Section 256-

1 is limited to the considerations set forth within Section 294-1, all of which relate to "potential

safety hazards." Pappalardo Aff. at ¶ 9.  Section 294-1(B) provides

> No shrub, fence, wall or other structure may be located on any land within 15 feet
> of the edge of the traveled way of any street within the limits of the village if such
> shrub, fence, wall or other structure obstructs or interferes with the view of
> drivers of vehicles on a driveway from a point on such driveway 15 feet from the
> traveled way to a minimum distance of 7 5 feet along the street, at a point more
> than 30 inches above the street level, and if, in the opinion of the Village
> Manager, after consulting with the Police Department, it creates a traffic hazard.

*Id.* Section 310-2 defines "structure" as "[a]n assembly of materials forming a construction

designed for useful purposes, including, among others, . . . signs . . . " *Id.* at ¶ 10.

Although Sections 196-17 and 256-1 were adopted before the current Village officials

were in office, various Village officials testified that these provisions are intended to "combat

visual blight" and "ensure that anything placed in the Village right-of-way does not create a

danger" by forcing pedestrians into the road or otherwise distracting drivers. Pappalardo Aff.

¶ 11; Salanitro Dep. Tr. at p. 7 of 17 ("to prevent any kind of visual obstruction or hazard to the

general public").

### III.    Enforcement

The Village is run by the Mayor and Village Manager, to whom the Chief of Police and

Superintendent of Public Works report. Affidavit of Andrew Matturo ("Matturo Aff.")  ¶ 3 (ECF

No. 46); Pappalardo Aff. at ¶ 2. The Superintendent of Public Works, in turn, supervises various

divisions including the Engineering Division. Salantiro Dep. Tr. at p. 5. For at least the past ten

years, the Village has "allowed for election signs to be posted on the grass area of the Village right-of-way for a period of time before the date of any election . . . . If a complaint were received, [the Village] would ask that the sign be moved from the right-of-way to one's property." Pappalardo Aff. ¶¶ 14  15; Pappalardo Dep. Tr. at pp. 12  14, 16 of 21; Berg Aff. Ex. 25 (ECF No. 40-40); Berg Aff. Ex. 28 ("Hochvert Dep. Tr.") at pp. 3  4, 6  7 of 9 (ECF No. 40-43).

Prior to 2017, the Village Manager's office would receive only "a handful of complaints" of improperly placed political signs per election cycle. Pappalardo Dep. Tr. at p. 16 of 21; Pappalardo Aff. ¶ 16; Matturo Aff. ¶ 11. When they received such complaints, they would advise callers that the Village does not usually remove political signs from the right-of-way and in the "rare" event that the complainant was insistent about a political sign in the right-of-way in front of their home, Village staff removed the offending sign. Pappalardo Dep. Tr. at p. 17 of 21.

### A.    Police Enforcement Policy

The Police often enforce compliance with the signposting law in response to tips and complaints from the public. Matturo Aff. ¶ 31; Dusavage Dep. Tr. at p. 9 of 13. Between 2006 and 2008, the Police responded to 48 such complaints. However, Police records indicate that 60  over half  of the 108 Police incident records involving improper signage from 2006 through 2018 were "self-initiated"  *i.e.*, a police officer identified and responded to the Code violation without initially receiving a complaint. Matturo Aff. Ex. A.

Regardless of how the signage violation came to the attention of the Police, officers have discretion over whether to issue warnings or violations for failures to abide by the sign policy. Matturo Aff. ¶ 22; Siciliano Dep. Tr. at pp. 4  5 of 21. This discretion has been uniformly exercised to avoid the issuance of summonses for improperly posted political signs, as records

indicate that the Police have never issued any summonses regarding political signs in the right-of-way, *id.* at ¶ 18. To this end, for at least the past thirty years, the Police have "accommodated" political signs by allowing them to remain in public places including the Village rights-of-way unless a complaint was made regarding a specific sign.[1] Matturo Aff. ¶¶ 9  10, 15, 20; Pappalardo Dep. Tr. at pp. 12  14 of 21; *see* Pl.'s SUMF Resp. ¶ 12 (admitting to this fact).

Of the 108 incidents listed in Police records involving improper signage from 2006 to 2018, sixteen incidents involved political signs and of those sixteen incidents, the Police issued no summonses, relocated one sign, and removed twelve signs. Matturo Aff. Ex. A. In other words, the vast majority of improperly placed signs that Police responded to were not political signs. *See* Matturo Aff. Exs. A and B. During the five-year period from January 2013 through January 2018, the Police confiscated thirty signs, only one of which was political and the rest of which were commercial. Berg Aff. Ex. 12 ("Police Incident Records") at pp. 1  2 of 46 (ECF No. 40-27); *see* Defs. SUMF Resp ¶ 35. In 2018, the Police removed two non-political signs from the right-of-way. Defs. SUMF Resp ¶ 34.

**B.      Police Enforcement Record in the Instant Matter**

---
[1]

When the Police enforce the Village Code with respect to signs in public places, including the Village right-of-way, they have almost always used Section 196-17, Siciliano Dep. Tr. at p. 6 of 21 (confirming that since he started with the Police in the 1990s, they have always used Section 196-17 for sign violations); *see* Matturo Aff. ¶ 14; ECF No. 40-37 (email from Police Captain to the Village Attorney "Just a note, in your email you reference Village Code 256:1, 'Permit required to Obstruct'. Just so you are aware, the PD's actions in removing the signs on the public right of ways is based upon Village Code 196:17, 'Posting Notices in Public Places'"); rarely, if ever, use Section 256-1, Matturo Aff. ¶ 27, and have never issued any summonses under either section, Matturo Aff. ¶¶ 26–28; Berg Aff. Ex. 11 ("Matturo Dep. Tr.") at pp. 9–10, 14, 33-38 of 41 (ECF No. 40-26); Dusavage Dep. Tr. at pp. 5–6 of 13 (ECF No. 40-6). As of February 13, 2019, the Police Department Policies, which reprints regularly used code sections, includes a note dated February 5, 2018 following the text for Section 256-1: "As per the Village Attorney, do not write 196:17 for Public Posting of Notices/Signs." Berg Aff. Ex. D at 2 of 4 (ECF No. 40-7). This Court's order enjoining enforcement of Section 256-1 was entered on February 6, 2018 and the record does not indicate that the Police ever sought to use Section 256-1 for sign enforcement.

Residents began contacting the Police on the morning of January 29, 2018 questioning whether certain political signs were illegally placed within the right-of-way. Defs' SUMF Resp. at ¶¶ 10, 12, 13. Shortly thereafter, with the Police Chief's agreement, the Police Captain emailed the Deputy Village Manager stating in relevant part:

> To be consistent with how election signs posted on the Village's right of way were handled in March of 2017, we are going to begin collecting any signs, including the upcoming School Bond Vote, that we observe posted on the right of way, or that we are notified are on the right of way and safeguard them at HQ were [sic] they can be picked up by the owners. Perhaps you want to put out a "Newsflash" reminding residents of the Village Code, and advising that any signs posted on the Village right of way (13 feet from the curb) will be removed.

Berg Aff. Ex. 9 (ECF No. 40-24).

Police officers were dispatched to investigate the complaints and requested that owners of Vote Yes signs within the right-of-way remove their signs from the right-of-way or, when the owner could not be located, removed signs from the Village right-of-way. Berg Aff. Ex. 14 ("1/29/2018 Incident Report") (ECF No. 40-29); Defs. SUMF Resp. ¶¶ 9, 12. The Police received additional calls from residents whose signs in the right-of-way had been removed and told such callers that the Police had removed the signs from the right-of-way and that the signs could be reclaimed at Police headquarters. *Id* at ¶ 9.

On February 3, 2018, an Officer reported to the Police Chief and Police Captain that "[t]he desk has received several calls about both 'No' and 'Yes' signs being posted. Several complainants have advised, that it has been getting around on Facebook about the village ordinance and now most signs are 13 feet back. I drove around, when I came in and the signs are now 13 feet back and posted on private property." Berg. Aff. Ex. 17 (ECF No. 40-32).

In response to this Court's February 6, 2018 order, on February 7, 2018, the Police issued to the department Special Order 18.09 stating in relevant part

> Effective immediately, the enforcement and/or removal of any sign placed on village property or right of way will cease.
>
> The department will not remove any signs place on village property or right of way, nor will a village code summons be issued to a person placing signs on village property or right of way. This will be for any sign, (i.e. commercial or political).
>
> Any caller reporting the posting of signs will be advised that no enforcement action can be taken at this time.

Berg Aff. Ex. B("Special Order 18.09") (ECF No. 40-5). The Police Chief intentionally made Special Order 18.09 applicable to all signs in the right-of-way "to handle signs equally." Matturo Dep. Tr. at p. 31 of 41; Dusavage Dep. Tr. at pp. 9  11 of 13. Special Order 18.09 remains in effect. Matturo Dep. Tr. at p. 31 of 41; Dusavage Dep. Tr. at p. 12 of 13. Defendants testified that since they ceased enforcing the sign ordinance in February 2018 as to all signs, they have not noticed a significant proliferation of signs in the Village or experienced increased complaints regarding signs in public ways or traffic or safety issues. *See, e.g.,* Matturo Dep. Tr. at p. 32 of 41; Dusavage Dep. Tr. at pp.12  13 of 13.

### C.      Department of Public Works Enforcement Record

The only division within the Department of Public Works with code enforcement responsibility for signage in public ways is the Engineering Division. Salantiro Dep. Tr. at pp. 10  11. Over the past twenty years, there have been "many instances" in which the Engineering Division was involved with signs posted in the right-of-way. *Id.* at pp. 11  12. In these instances, regardless of the type of sign, the Engineering Division either notified the sign-poster that the sign was posted in violation of the Village Code or, when the sign-poster could not be ascertained, removed the sign to store it in the Village building in case anyone came to claim it. *Id*. at p. 13. When the Engineering Department receives complaints, it "endeavor[s] to have offending non-political signs removed." Goessl Aff. ¶ 6. In situations involving sign posting

violations, the Engineer has discretion over whether to issue a letter of violation or a summons. Berg Aff. Ex. H ("Goessel Dep. Tr.") at p. 10 of 32 (ECF No. 40-11).

The Superintendent of Public Works testified that he was not aware of issues regarding political signs in the right-of way prior to 2017, Salanitro Dep. Tr. at p. 7 of 17, but that in March of 2017 and again in 2018, the Department of Engineering removed various political signs in the Village right-of-way consistent with the general policy of removing signs from the Village right-of-way or requesting that they be moved. Salanitro Dep. Tr. at p. 2 of 17.

The Village Engineer, who has held his position since December 2016, testified that from December 2016 through November 2019, the office of the Village Engineer has "continuously acted with respect to non-political signs [when it] removed or impounded numerous non-political signs that were capable of being removed." Goessl Aff. ¶4; Goessl Dep. Tr. at p. 17 of 32. However, it "has never received complaint regarding political signs in the Village right-of-way and, as a result, has never taken any action of any nature with respect to political signs . . ." *Id.* at ¶ 3; Goessel Dep. Tr. at pp. 16, 18 of 32. The Village Engineer has never received a permit application to post a temporary political sign in the Village right-of-way.[2] Goessl Dep. Tr. at p. 31 of 32. Accordingly, the Village has never issued a permit to post a temporary political sign in the Village's right-of-way. Pappalardo Dep. Tr. at pp. 18  20 of 21.

IV.        **Procedural History**

On February 5, 2018, Plaintiff filed this lawsuit seeking injunctive relief, declaratory judgment, and nominal and compensatory damages. On February 6, 2018, following a Show Cause Hearing, this Court granted Plaintiff's application for a preliminary injunction and

---

[2]         The Village Engineer opined that he has never received such an application because "the code is not specific enough to deal with signs as such. I don't know if—I don't think—in my opinion, a licensing agreement doesn't apply to a temporary sign." Goessl Dep. Tr. at p. 31 of 32.

temporary restraining order, enjoining Defendants from taking any actions against Mr. Berg or other persons with respect to posting political lawn signs in the Village right-of-way in front of private homes, so long as said political lawn signs pose no safety or traffic hazards. (ECF No. 6)

Discovery is complete and the parties have filed the instant Motion and Cross-Motion.

## LEGAL STANDARD

### I.    Summary Judgment

"Where, as here, cross motions for summary judgment are filed, we 'evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quoting *Hotel Emps. & Rest. Emps. Union v. N.Y.C. Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir. 2002)). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party must support its position by citing to materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1). Affidavits may be used to support or oppose summary judgment if the affidavit is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d. Cir. 2012). Importantly, a court may only consider facts that are admissible in evidence. *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S.

242, 248 (1986). A court should grant summary judgment when a party who bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323 (internal quotation marks omitted).

"[W]hen confronted with evidence of facts that would support summary judgment, the [nonmoving party] must come forward with evidence in admissible form that is capable of refuting those facts." *George v. Rockland State Psych. Ctr.*, No. 10-cv-8091(NSR), 2014 WL 5410059, at *3 (S.D.N.Y. Oct. 23, 2014) (quoting *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 177 (S.D.N.Y. 2009)) (internal quotation marks omitted). The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Further, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

## II.   Municipal Liability Under Section 1983

Section 1983 provides that: " [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."

13

*Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d

Cir. 2010).

> Local governing bodies . . . can be sued directly under § 1983 for monetary,
> declaratory, or injunctive relief where, as here, the action that is alleged to be
> unconstitutional implements or executes a policy statement, ordinance, regulation,
> or decision officially adopted and promulgated by that body's officers. Moreover,
> although the touchstone of the § 1983 action against a government body is an
> allegation that official policy is responsible for a deprivation of rights protected
> by the Constitution, local governments, like every other § 1983 "person," by the
> very terms of the statute, may be sued for constitutional deprivations visited
> pursuant to governmental "custom" even though such a custom has not received
> formal approval through the body's official decisionmaking channels.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690  91 (1978).

## DISCUSSION

Plaintiff seeks summary judgment on his claims that Sections 196-17 and 256-1 violate

the due process clause of the Fourteenth Amendment because they are unconstitutionally vague

and the First Amendment as unconstitutional content-based restrictions on speech. Defendants

cross-move for summary judgment arguing that the provisions are permissible content-neural

regulations of speech. Plaintiff also contends that the Village's policy of selective enforcement

of the Village Code provisions violates the First Amendment as applied.[3]

## I.    Fourteenth Amendment Vagueness Challenges

The Fourteenth Amendment to the United States Constitution provides that no state shall

"deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend.

xiv. Among the most fundamental protections of due process is the principle that "[n]o one may

---

[3]      Defendants also ask the Court to strike Plaintiff's Rule 56.1 statement and affidavit as improperly lengthy
and replete with inappropriate legal argumentation and conclusion, and Plaintiff, in turn, asks the Court to strike
certain portions of the affidavits Defendants submitted in support of their papers. To the extent any of these
submissions are inappropriate, the Court has disregarded those portions and its analysis relies only upon admissible
evidence. *See Morris v. Northrop Grumman Corp.,* 37 F. Supp. 2d 556, 569 (E.D.N.Y. 1999) ("[R]ather than
scrutinizing each line . . . and discussing whether they contain conclusory allegations, legal arguments, or hearsay . .
. the court . . . will only consider [ ] evidence that is admissible.").

be required at peril of life, liberty or property to speculate as to the meaning of . . . statutes. All are entitled to be informed as to what the State commands or forbids." *Cramp v. Bd. of Pub. Instruction,* 368 U.S. 278, 287 (1961) (citation omitted) (alterations in original). In reviewing a statute's language for vagueness, "we are relegated . . . to the words of the ordinance itself . . . and perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." *Grayned v. City of Rockford,* 408 U.S. 104, 110 (1972) (internal quotation marks and footnotes omitted). "The degree of vagueness tolerated in a statute varies with its type," *Rubin v. Garvin,* 544 F.3d 461, 467 (2d Cir. 2008), and when a statute "is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts," *Farrell v. Burke,* 449 F.3d 470, 485 (2d Cir. 2006) (internal quotation marks omitted).

"Supreme Court precedent recognizes two independent grounds upon which a statute's language may be so vague as to deny due process of law." *Cunney v. Bd. of Trustees*, 660 F.3d 612, 620 (2d Cir. 2011). "First, a law violates due process 'if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.'" *Id.* at 620-21 (quoting *Hill v. Colorado,* 530 U.S. 703, 732 (2000)). "Second, a law is unconstitutionally vague if 'it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Id.* at 621 (quoting *Hill,* 530 U.S. at 732). Plaintiff challenges both provisions under the first ground and Section 256-1 under the second.

### A.   Notice

"Animating this first vagueness ground is the constitutional principle that individuals should receive fair notice or warning when the state has prohibited specific behavior or acts." *Thibodeau v. Portuondo,* 486 F.3d 61, 65 (2d Cir. 2007). The relevant inquiry is "whether

the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Rubin,* 544 F.3d at 467 (internal quotation marks and citations omitted). If the Court determines that a provision "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," then the ordinance must be struck down as unconstitutionally vague. *Hill,* 530 U.S. at 732.

Plaintiff claims that both Section 196-17 and Section 256-1 are unconstitutionally vague because they fail to provide sufficient notice. Because the language of both provisions clearly notifies persons of ordinary intelligence what is proscribed, they are not unconstitutionally vague and Plaintiff's additional arguments regarding section headings and officials' skepticism of their coverage are unpersuasive.

### 1.    *Section 196-17*

We begin with Section 196-17, which broadly bans any person from "post[ing], attach[ing] or display[ing] any sign, notice, placard, poster, or other advertising medium to or upon or over any sidewalk, tree, stone, fence, wall, pole, railing or other object in, along, upon, or over any street, park or other public place in the village." Pappalardo Aff. ¶ 4. The breadth of the application of Section 196-17 is emphasized by the many detailed alternate terms used to describe what is proscribed. First, it lists three separate proscribed actions: one may not "post, attach, or display." Second, it applies broadly within "the village" and is not limited to any particular zone of the Village such as a residential area or downtown shopping district. Third, the provision broadly describes the object that may not be placed as a "sign, notice, placard, poster, or other advertising medium," which represents a range of sizes and constructions. The use of the disjunctive "or" before "other advertising media" indicates that the provision is not intended to apply only to commercial speech. *Cf. Mizrahi v. Gonzales*, 492 F.3d 156, 164 (2d Cir. 2007)

("It is a standard canon of statutory construction that words separated by the disjunctive are intended to convey different meanings unless the context indicates otherwise."). Finally, the provision painstakingly details any conceivable surface "to or upon" which signs may not be posted, concluding with the catchall "or other public place in the village." "Public place" is in turn defined within Chapter 196 in Section 196-2 as "any and all streets, sidewalks, boulevards, alleys or other public ways and any and all public parks, squares, spaces, grounds and buildings." Pappalardo Aff. ¶ 6.

Plaintiff contends that, despite the significant breadth and detailed examples contained in Section 196-17, the Section is nonetheless vague because it does not contain the magic term "right-of-way" and therefore deprives residents of notice that they may not post signs on the Village right-of-way. Pl.'s Mem. in Supp. at 17 (ECF No. 42). However, Section 281-2 defines "right-of-way" as "[g]enerally, the space owned by the Village extending approximately 13 feet from each curbline," 1/29/2018 Altizio Email, which adequately notifies the public that the Village owns the right-of-way and therefore that it is a "public place" within the meaning of Section 196-17. In sum, "we can never expect mathematical certainty from our language," *Grayned*, 408 U.S. at 110, but both provisions "clearly 'delineat[e their] reach in words of common understanding," *id.* at 112 (quoting *Cameron v. Johnson*, 390 U.S. 611, 616 (1968)).

Plaintiff also contends that despite the language of Section 196-17, its placement within a Chapter entitled "Littering and Handbills" demonstrates that the provision is "only intended to prevent litter, especially from handbills," and therefore is limited by the definition of "litter" in Section 196-2. Pl.'s Mem in Supp. (ECF No. 42). However, by its terms, Section 196-17 applies broadly to "any sign, notice, placard, poster, or other advertising medium" without mention of whether such items have been abandoned. In any event, "[t]itles and section headings can serve

17

as limited interpretive aids if the statute itself is ambiguous," *United States v. Castro*, 837 F.2d 441, 442 (11th Cir. 1988), but they "cannot limit the plain meaning of the text and may be utilized to interpret a statute, if at all, only where the statute is ambiguous," *Scarborough v. Office of Personnel Mgmt.,* 723 F.2d 801, 811 (11th Cir. 1984). In sum, Section 196-17 is not unconstitutionally vague.

### 2.    *Section 256-1*

We next turn to Section 256-1, which broadly provides: "[n]o person shall obstruct any street, sidewalk, public easement or other public place without first securing a written permit from the Village Engineer." Papalardo Aff. ¶ 7. Section 256-1, like Section 196-17, uses the construction "public place" but it further specifies that it applies to a "street, sidewalk, public easement." *Id.* Not only does the term "public place" appear in Chapter 196, as described above, the term, in its normal usage, provides sufficient notice to persons of ordinary intelligence that the provision applies to Village rights-of-way, which are publicly owned.[4]

Plaintiff contends that Section 256-1 is impermissibly vague because the Village Code does not define "obstruct" or "obstruction." However, "*Webster's Third* defines 'obstruction' as 'something that obstructs or impedes,' and defines 'obstruct' as to 'block up.'" *Betancourt v. Bloomberg*, 448 F.3d 547, 553 (2d Cir. 2006) (quoting *Webster's Third New International Dictionary* (1976)*).* We may further consider the definitions provided by the Village Manager, who attested  "[i]f any object is placed or erected in the right-of-way, it thereby excludes anyone else from occupying that space and, hence, is an obstruction," Pappalardo Aff. ¶ 9, and the Superintendent of the Department of Public Works who attested that obstruction means

---

[4]    Plaintiff's initial emails to the Village Attorney and others indicate that he mistakenly believed the Village had an easement over rather than fee simple ownership of the right of way. *See* Berg. Aff. Ex. 21 at pp. 3–4 of 4 (ECF No. 40-36). Even if that were the case, Section 256-1 would clearly apply to the Village "right-of-way" since it is applicable by its terms to any "public easement or other public place." *See* Pappalardo Aff. ¶ 7.

"placement of an item or something without permission . . . . anything that is placed in the village right-of-way, that is not normal to the village right-of-way," Salanitro Dep. Tr. at p. 11 of 17, which are consistent with common understanding enshrined in the dictionary.

That the provision neither specifies the duration of the proscribed obstruction nor the quantum of the disturbance does not render it vague. *Betancourt,* 448 F.3d at *553* ("An object plainly may 'obstruct[ ] or impede[ ]' without doing so permanently. Had the lawmakers intended 'obstruction' to [to be] permanent . . . , they could have simply added that adjective before 'obstruction.'"); *Grayned*, 408 U.S. at 109  11 (rejecting a facial vagueness challenge where it was "clear what the ordinance as a whole prohibits," even though the statute at issue did not specify the prohibited quantum of disturbance). Section 256-1 clearly indicates that any person wishing to block or impede a public space must seek a permit from the Village Engineer to do so.

Plaintiff further argues that the provision is impermissibly vague because, as a matter of practice, no one has ever sought a permit to place a temporary political sign in a Village right-of-way, the Village has never issued a permit to place a temporary political sign in the Village right-of way, and the Village Engineer expressed uncertainty over whether such a permit would be required. At bottom, the failure to apply a law is neither relevant to, nor dispositive of, whether the law is vague. "[A]lthough the [official charged with enforcing the ordinance's] understanding of the ordinance's terms is relevant 'perhaps to some degree,' our inquiry begins with the text of the ordinance," *Grayned*, 408 U.S. at 110, and the Court has already determined that the plain language of Section 256-1 clearly sets forth what is proscribed.

Accordingly, the Court disagrees that Sections 196-17 and 256-1 fail to provide notice to persons of ordinary intelligence.

### B.      Enforcement Standards

We now turn to Plaintiff's claim that Section 256-1 is also vague because it lacks sufficient enforcement standards. "Statutes must 'provide explicit standards for those who apply' them to avoid 'resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" *Cunney*, 660 F.3d at 612 (quoting *Grayned,* 408 U.S. at 108  09). To determine whether it contains sufficient enforcement standards we consider whether "(1) the '[the ordinance] as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement'; or (2) 'even in the absence of such standards, the conduct at issue falls within the core of the [ordinance's] prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the [ordinance].'" *Id.* at 622 (quoting *Farrell v. Burke,* 449 F.3d 470, 494 (2d Cir. 2006)). Plaintiff argues that Section 256-1 fails to provide the requisite enforcement standards because it proscribes obstruction without a permit from the Village Engineer but fails to provide standards by which the Village Engineer is to evaluate such permit applications.

While it is true that the current version Section 256-1 does not itself contain enforcement standards other than a three-day time period in which the Village Engineer must grant or deny the application, Pappalardo Aff. at ¶ 7, those standards appear in a separate section, Section 294-1(B), which provides:

> No shrub, fence, wall or other structure may be located on any land within 15 feet of the edge of the traveled way of any street within the limits of the village if such shrub, fence, wall or other structure obstructs or interferes with the view of drivers of vehicles on a driveway from a point on such driveway 15 feet from the traveled way to a minimum distance of 7 5 feet along the street, at a point more than 30 inches above the street level, and if, in the opinion of the Village Manager, after consulting with the Police Department, it creates a traffic hazard.

Pappalardo Aff. at ¶ 9. Section 310-2 in turn defines "structure" to include "signs." *Id.* at ¶ 10. Plaintiff's assertion that the Village Engineer's review of permits under Section 256-1 is not limited to the considerations in Section 294-1(B) is not supported by any admissible evidence. Accordingly, the Court finds that the Code provides sufficient enforcement standards and therefore that Section 256-1 is not unconstitutionally vague.

In sum, the Court finds that neither Section 196-17 nor Section 256-1 is void for vagueness.

## II.    First Amendment Challenges

We turn now to the parties' First Amendment arguments. The First Amendment "provides that 'Congress shall make no law abridging the freedom of speech.'" *Hobbs v. County of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005) (quoting U.S. Const. amend. I). The limitations that the First Amendment places on the federal government apply to municipalities. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

This case involves political and social advocacy signs Plaintiff and other village residents sought to display in the Village right-of-way in front of their homes. "Often placed on lawns or in windows, residential signs play an important part in political campaigns, during which they are displayed to signal the resident's support for particular candidates, parties, or causes." *City of Ladue v. Gilleo,* 512 U.S. 43, 55 (1994). That said, despite their historic use, there is no question that some regulation of such signs is permissible, especially with respect to posting on public rather than private property. *See, e.g.*, *Johnson v. City & County of Philadelphia*, 665 F.3d 486, 492 (3d Cir. 2011) (upholding content neutral ordinance prohibiting all speech in the form of temporary signs on utility poles, streetlights, sign posts, and trees in the public right-of-way and determining that even inside the city of Philadelphia, which does not have much lawn space,

there were alternatives for communication); *Pritchard v. Town of New Hartford*, No. 6:14-CV-1477, 2016 WL 4523986, at *3 (N.D.N.Y. Aug. 22, 2016) (upholding as "measured and content-neutral" ordinance that banned all temporary signs in the right-of-way and restricted the size of all signs in residential neighborhoods); *Sugarman v. Village of Chester*, 192 F. Supp. 2d 282, 295 (S.D.N.Y. 2002) (upholding ordinances that applied generally to all temporary signs but striking down ordinances that singled out political signs but not other types of signs for unique durational requirements). Recognizing that such regulation can be permissible, we turn to whether the Village's sign policy unconstitutionally proscribes protected First Amendment speech.

### A.    Time, Place, & Manner

We first consider whether the challenged policy is content-based or content-neutral since "the scope of protection for speech generally depends on whether the restriction is imposed because of the content of the speech." *Universal City Studios, Inc. v. Corley,* 273 F.3d 429, 450 (2d Cir. 2001). "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation mark and citation omitted). Content-neutral regulations may "limit the time, place, or manner of expression . . . even in a public forum," so long as the regulations are "reasonable," "narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information." *Hobbs*, 397 F.3d at 149 (citation omitted).

On its face, the Village Code's prohibition of unpermitted posting of signs on public property in the village is content-neutral because the provisions apply to all signs and obstructions without reference to their content or viewpoint. Section 196-17 applies to "any sign,

notice, placard, poster, or other advertising medium." Pappalardo Aff. ¶ 4. While "advertising medium" is included in the list, it is separated by the disjunctive "or" so the provision is not limited by its terms to any type of speech, commercial or otherwise. *Cf. Mizrahi*, 492 F.3d at 164. Section 256-1 similarly states that "no person shall obstruct . . ." without any reference to any speech content of the obstruction. Pappalardo Aff. ¶ 7. The conditions relevant to the Village Engineer's decision to grant or deny a permit application under Section 256-1 similarly make no reference to the speech content of any potential obstruction. Pappalardo Aff. ¶ 9. Accordingly, both provisions are content neutral.

We next consider whether the Village's sign ordinance furthers a substantial government interest. While neither provision contains a preamble or enactment note clearly stating the purpose for which the sign provisions were enacted, it is nonetheless clear that both Sections 196-17 and 256-1 further substantial government interests. Based on its location in the Village Code's chapter on litter and statements by Village official, Section 196-17 is related to esthetic concerns, which many courts have found to constitute a significant government interest.[5] *See, e.g.*, *Taxpayers for Vincent*, 466 U.S. at 805 ("The problem addressed by this ordinance  the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property  constitutes a significant substantive evil within the City's power to prohibit."); *id.* at 808 ("The plurality wrote in *Metromedia*: 'It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.' The same is true of posted signs." (quoting *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 510 (1981))).

---

[5] In fact, while he wishes that the regulation applied only to commercial signs, Plaintiff concedes that "Scarsdale has a legitimate interest in preventing . . . advertising . . . from becoming visual eyesores and later rubbish on its streets." Pl.'s Mem in Opp'n at 15.

The Village's additional stated interest, particularly with respect to Section 256-1, in pedestrian and traffic safety are also significant public interests. Even if the Code does not explicitly state that it is intended to advance pedestrian and traffic safety, "[t]he very purpose of establishing rights-of-way is to bolster traffic safety, which is in itself a substantial interest." *Lewis v. Searles*, No. 2:02-CV-259, 2002 WL 31947782, at *6 (D. Vt. Oct. 23, 2002). And further, the considerations for issuance of a permit under Section 256-1 in Section 294-1(B) indicate that the law is concerned with "obstruct[ion] or interfer[ence] with the view of drivers of vehicles on a driveway" and whether the obstruction "creates a traffic hazard." Pappalardo Aff. ¶ 9. Pedestrian and traffic safety are substantial government interests. *Clear Channel Outdoor, Inc. v. City of New York,* 594 F.3d 94, 103 (2d Cir.2010) ("maintaining traffic safety" is a substantial government goal). Accordingly, the ban on signposting set forth in Sections 196-17 and 256-1 furthers significant government interests. *Metromedia*, 453 U.S. at 507  08 (1981) (holding that there can be no "substantial doubt that . . . traffic safety and the appearance of the city [ ] are substantial governmental goals").

Having determined that the provisions further substantial government interests, we consider whether they are "narrowly tailored" to do so. For content neutral regulation, "[t]he narrow tailoring requirement is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Hobbs*, 397 F.3d at 149 (citation omitted). If, as here, the Village has a basis for believing that a specific form of speech such as signs on public property are "traffic hazards and are unattractive, 'then obviously the most direct and perhaps the only effective approach to solving the problems they

create is to prohibit them.'"[6] *Taxpayers for Vincent*, 466 U.S. at 817 (quoting *Metromedia*, 453 U.S. at 508)).

Finally, the Village's sign regulation clearly leaves ample opportunities for protected speech where it regulates the posting of signs only in public places and not on private property.[7] *See Taxpayers for Vincent*, 466 U.S. at 795, (describing district court finding that ample opportunities existed where plaintiffs "remain[ed] free to picket and parade, to distribute handbills, to carry signs and to post their signs and handbills on their automobiles and on private property with the permission of the owners thereof"). Accordingly, the Village's sign ordinances are permissible content neutral time, place and manner restrictions.[8]

---

[6]      Defendants' testimony that signs have not proliferated to the detriment of their substantial government interests since they stopped enforcing any signposting laws under Special Order 18.09 in response to this Court's order, *e.g.*, Matturo Dep. Tr. at p. 32 of 41 (stating that the Police have not experienced additional traffic or safety hazards in the right-of-way); Dusavage Dep. Tr. at pp. 12–13 of 13 (admitting that there are more signs in the right-of-way but stating that he was not aware of a significant increase in complaints or safety or traffic hazards), does not invalidate these constitutionally permissible code sections where, as here, one of the harms sought to be prevented is presence of signs, which has esthetic impacts within the Village in and of itself, not just through the secondary harms of litter or traffic and pedestrian safety.

[7]      This case is thus distinguishable from *City of Ladue* and *Lusk*, both of which involved ordinances that reached private in addition to public property because the Village only attempts to regulate signposting in public places, including the Village rights-of-way, and not on private property. *City of Ladue*, 512 U.S. at 54 (explaining that signposting policy foreclosing any residential signposting to political, religious, or personal messages was unconstitutional); *Lusk v. Village of Cold Spring*, 475 F.3d 480, 492 (2d Cir. 2007) (holding that village's aesthetic interests did not justify regulations effectively foreclosing residential signs within a historical district). In fact, the *Lusk* court explicitly contemplated whether the ordinance at issue would apply to "a traditional yard sign that was not attached to, or leaning against any structure," and noted that the municipality was constitutionally able to determine whether outdoor signs should be permitted on residential property within the district as long as the determination was based on the review of the architecture and design of the signage rather than the content, 475 F.3d at 494-94.

[8]      Plaintiff is also mistaken that the permitting regime of Section 256-1 is an unconstitutional prior restraint. While it is true that "[a] law requiring prior administrative approval of speech falls within the prior restraint rubric," but it is only an "invalid prior restraint" if it is "without narrow, objective, and definite standards to guide the licensing authority." *Lusk*, 475 F.3d at 485. The Court already determined that the permit standards in Section 294-1(B) implicated by Section 256-1 are not impermissibly vague. They are also not unconstitutional prior restraints where the permit considerations provide specific hazard-focused standards without reference to the speech content of any potential obstruction. The fact that Section 256-1 contains a three-day deadline for the Village Engineer to approve or deny a permit makes this case distinguishable from *Lusk*, in which the court determined that an approval period that could drag on for seventy-five days and left the Plaintiff with no alternative methods of pursuing political speech in the meantime was "of little consolation to Lusk and those like him in this regard, and of little use to their neighbors or the political process." 475 F.3d at 492. Accordingly, the permitting regime under Section 256-1 is not an unconstitutional prior restraint.

         To the extent the Village maintains that the Fees & Charges Schedule, which lists a fee of $1,250.00 for a Right-of-Way License Agreement/Permit does not apply to temporary political signs, *see* Defs' SUMF Resp. ¶ 62;

**B.      Content-Based Selective Enforcement**

Having determined that the sections of the Village's code are not facially unconstitutional under either the Fourteenth Amendment's Due Process Clause or the First Amendment, we turn to Plaintiff's as-applied selective enforcement challenge. Plaintiff argues that during the run-up to the Bond Referendum Defendants engaged in discriminatory enforcement against signs containing political as opposed to commercial speech and within their enforcement against the political signs, discriminated against signs supporting the Bond Referendum relative to those opposing it. In other words, Plaintiff does not merely challenge the application of these ordinances to him, rather he argues that Defendants have developed a policy of enforcing the sign laws selectively in a content and viewpoint discriminatory way. Such a challenge is "dependent on the factual evidence provided as to how the statutory scheme has in fact operated vis-à-vis the plaintiff[]." *Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011) (quoting *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004)).

"Courts must be willing to entertain the possibility that content-neutral enactments are enforced in a content-discriminatory manner. If they were not, the First Amendment's guarantees would risk becoming an empty formality, as government could enact regulations on speech written in a content-neutral manner so as to withstand judicial scrutiny, but then proceed to ignore the regulations' content-neutral terms by adopting a content-discriminatory enforcement policy." *Hoye*, 653 F.3d at 854. "[I]n order to establish municipal liability for selective enforcement of a facially viewpoint- and content-neutral regulation, a plaintiff whose evidence consists solely of the incidents of enforcement themselves must establish a pattern of

---

Pappalardo Aff. ¶ 12, that interpretation is permissible so long as it is inapplicable to such signs because of their temporary nature or for another content neutral reason. If, however, the Village means to say that the fee is applicable to non-political temporary signs, it would be an impermissible content-based selective enforcement policy.

enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content." *Brown v. City of Pittsburgh*, 586 F.3d 263, 294 (3d Cir. 2009).

Here, Defendants have impermissibly considered the content of signs placed in public places to the extent they provided preferential treatment to political signs by rarely enforcing the sign laws against them. Defendants concede that for some time at least the Village Manager's office and the Police have had a policy of not enforcing the ban on the posting of signs on public places, including the Village right-of-way, against political signs. *See, e.g.,* Pappalardo Aff. ¶ 14; Matturo Aff. ¶ 28. Since any distinction between types of speech is proscribed by the First Amendment, *see Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) (observing, without elaboration, that even under an otherwise valid statute, a pattern of "[g]ranting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional"); *Taxpayers for Vincent,* 466 U.S. at 816 ("[E]ven though political speech is entitled to the fullest possible measure of constitutional protection, there are a host of other communications that command the same respect . . . . To create an exception for appellee's political speech and not these other types of speech might create a risk of engaging in constitutionally forbidden content discrimination."), this selective enforcement policy violates the First Amendment, *Hoye*, 653 F.3d at 855 (holding that "the City's own pronouncements definitively articulate a content discriminatory enforcement policy" even if that policy was unwritten).

The record clearly demonstrates that until 2018 Defendants gave preferential treatment to political signs and that rather than creating a new policy to discriminate against political speech beginning in 2017, the Police merely began to subject such signs to the same general

proscription that it had consistently applied to all other types of signs: no signs are permitted in the Village's right-of-way.[9],[10] *See, e.g.*, Pl's 56.1(b) ¶ 12 (admitting to Police's 30-year policy of "accommodating" political speech); Hochvert Dep. Tr. at pp. 3‑4, 6‑7 of 9.

It should be noted that in response to this Court's temporary restraining order and preliminary injunction, the Police issued Special Order 18.09 explicitly halting enforcement of the signposting laws as to all types of signs in order "to handle signs equally." Matturo Dep. Tr. at p. 31 of 41; Dusavage Dep. Tr. at pp. 9-11 of 13. In other words, both the 2017 and 2018 application of the sign ban to all impermissibly posted signs (without the typical accommodation for political signs) and the current approach of not applying the sign ordinances against any signs are content-neutral enforcement policies because they enforce the signposting laws without consideration of the content of the sign. *See, e.g.*, *Constr. & Gen. Laborers' Union No. 330 v. Town of Grand Chute*, 915 F.3d 1120, 1123 (7th Cir. 2019) ("a municipality is entitled to implement a nondiscriminatory ban of *all* private signs from the public roads and rights-of-way" (emphasis in original)). However, Defendants' prior preferential treatment toward political signs effectively discriminated against all other types of signs and therefore violated the First Amendment.

---

[9]
      Since Plaintiff has failed to submit any evidence to support his claim that the Police discriminated against him based on his viewpoint, we need not consider his further claim that the complaint-based approach is necessarily impermissible because it can result in viewpoint-based discrimination. "While a complaint-driven system of enforcement could theoretically leave some unreported violations unabated, an efficient allocation of limited enforcement resources provides a rational basis for a complaint-based system." *Jensen v. County of Sonoma*, 444 F. App'x 156, 158 (9th Cir. 2011); *see also Osborne v. Grussing*, 477 F.3d 1002, 1007 (8th Cir. 2007) (noting that municipalities "routinely act on the basis of information provided by private parties who harbor a grudge," but when "such a complaint results in enforcement action, we do not impute the complainant's ulterior motive to the government enforcers").

[10]
      To the extent Defendants believe that their enforcement policy was permissible because it was maintained through practice rather than codified in the Village Code or other Village regulation, *see* Defs' SUMF Resp. ¶ 36; Feb. 1-2 Email Chain at pp. 1–2 of 4, they are mistaken. Municipalities can cause "constitutional deprivations . . . pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 691. The Village's policy of accommodating political signs around elections is such a "custom."

Because the Village Code contains permissible content-neutral regulations of speech, the Court vacates its temporary restraining order and preliminary injunction at ECF No 6 and declines to permanently enjoin enforcement of the Code. The Village may hereby resume its enforcement of these provisions so long as it does so consistent with the dictates of the First Amendment. Any enforcement that considers the type of sign or the viewpoint expressed would violate the First Amendment. In other words, in order to comply with the First Amendment's mandate that government not give preference to any specific type of speech relative to another, the Village is free to enforce the proscription against the posting of signs on public property, including in the Village rights-of-way, as to all types of signs or as to none of them but it cannot selectively enforce based on whether a sign contains political, commercial, or another type of speech.

## CONCLUSION

In sum, the Court GRANTS Plaintiff's Motion to the extent it asserts a claim that Defendants violated the First Amendment by selectively enforcing the signposting laws against political relative to other forms of speech and DENIES Plaintiff's motion as to the remaining claims. The Court GRANTS Defendants' Cross-Motion to the extent that the ordinances are not facially unconstitutional under either the Fourteenth Amendment's Due Process Clause or the First Amendment but DENIES their motion to the extent they claim that their content-based enforcement was consistent with the First Amendment.

Accordingly, the Court respectfully directs the Clerk of the Court to: (1) terminate the motions at ECF Nos. 39 and 43; (2) vacate the preliminary injunction at ECF No. 6; (3) enter judgment in Defendants' favor to the extent that the ordinances are not unconstitutional under either the First or Fourteenth Amendments, and in Plaintiff's favor to the extent that Defendants'

content based selective enforcement policy violates the First Amendment; (4) mail a copy of this

opinion and order to pro se Plaintiff at the address listed on ECF and show service on the docket;

and (5) terminate the case.


Dated: November 12, 2020                          SO ORDERED:
         White Plains, New York

                                    _____
                                              NELSON S. ROMÁN
                                          United States District Judge